UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

KAREN B. MEYER,                          )
(Social Security No. XXX-XX-8717),       )
                                         )
                    Plaintiff,           )
                                         )
            v.                           )          3:09-cv-137-WGH-RLY
                                         )
COMMISSIONER OF SOCIAL SECURITY,         )
MICHAEL J. ASTRUE,                       )
                                         )
                    Defendant.           )


**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 11,

25) and an Order of Reference entered by Chief Judge Richard L. Young on

January 28, 2011 (Docket No. 26).


**I.  Statement of the Case**

Plaintiff, Karen B. Meyer, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability

Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§

416(i), 423(d); 20 C.F.R. § 404.1520(f).  The Court has jurisdiction over this

action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on May 24, 2006, alleging disability since May 3,

2006.  (R. 107-09).  The agency denied Plaintiff's application both initially and on

reconsideration.  (R. 65-68, 71-73).  Plaintiff appeared and testified at a hearing

before Administrative Law Judge William Hafer ("ALJ") on November 10, 2008. (R. 24-62). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 24). On March 31, 2009, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 12-23). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on October 1, 2009, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on September 30, 1964, Plaintiff was 44 years old at the time of the ALJ's decision, with a high school education. (R. 21). Her past relevant work experience included jobs as a child care worker (light/semi-skilled) and manager (light/skilled). (R. 21).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

##### a.  Physical Impairments

On February 21, 2006, Plaintiff complained of low back pain that had persisted for the past three to four weeks to Jose Mijares, M.D. (R. 275-76). Dr. Mijares found relatively normal results. (R. 276).

On May 9, 2006, Plaintiff saw Sanford Schen, M.D., for complaints of progressive dyspnea at relatively low levels of exercise with some chest pain. (R.

206-07).  Plaintiff also had some soreness in her left neck and left shoulder.  (R. 206).  On physical examination, Plaintiff was in no acute distress, and Dr. Schen's findings were normal.  (R. 207).  Dr. Schen wrote that "[o]verall, there is not much to find."  (R. 206).

On September 12, 2006, Plaintiff was evaluated by N. Shireen Mufti, M.D., a neurologist, for complaints of tremors and shakes in her legs that had progressed into her hands.  (R. 399-400).  On examination, Dr. Mufti observed that Plaintiff was in no distress, neurological testing and sensation were normal, and plaintiff displayed no posterior tremors, no resting tremors, and no drift.  (R. 399-400).  Dr. Mufti diagnosed restless leg syndrome.  (R. 400).

On November 7, 2006, Plaintiff followed up with Dr. Mufti for continued complaints of shaking.  (R. 398).  Dr. Mufti observed that Plaintiff was shaking all over when he walked into the examination room, but that once her attention was diverted she stopped shaking.  (R. 398).

Plaintiff was seen by rheumatologist, Mujtaba F. Tapal, M.D., on September 27, 2007, with complaints of diffuse pain all over, with pain in her lower back being the worst.  (R. 405-09).  Plaintiff had minimal decrease in range of motion of her cervical spine, some muscle tenderness in the lumbosacral spine, and some fibromyalgia tender points, but otherwise relatively normal results.  (R. 408).  She was diagnosed with degenerative disc disease and fibromyalgia.  (R. 409).

On October 22, 2007, Plaintiff was in an automobile accident and was treated in the emergency room for complaints of left leg and generalized neck

pain; she had mild tenderness at C5. (R. 414-15). A CT scan of her cervical spine showed spondylotic changes and degenerative disc disease at C5-6 and C6-7, with mild foraminal narrowing. (R. 416).

On November 20, 2007, Plaintiff was evaluated by Mike Chou, M.D., a neurosurgeon, for complaints of neck pain, shoulder pain, hand tingling, and right arm pain. (R. 444-45). Dr. Chou reviewed an MRI of her cervical spine, which showed a soft herniated disc at C6-7 and a disc protrusion at C5-6. (R. 445, 449). On exam, Plaintiff demonstrated a good range of motion in her neck, but some tenderness; otherwise she was intact neurologically and had normal reflexes and good strength in all four extremities. (R. 445). Dr. Chou assessed Plaintiff with multiple cervical radiculopathies resulting from her protruded discs and recommended physical therapy, but indicated that surgery might be necessary. (R. 445).

On December 7, 2007, an MRI of the lumbar spine showed a right foraminal annular tear at L5-S1 and degenerative disc disease at L4-5 and L5-S1. (R. 447).

On December 17, 2007, after physical therapy did not help, Dr. Chou performed a discectomy and fusion of C5-6 and C6-7. (R. 443, 451-52). On follow-up on January 15, 2008, Plaintiff reported that her arm pain was mostly gone, and Dr. Chou noted that she was doing fine. (R. 439).

On February 28, 2008, Plaintiff followed-up with Dr. Tapal. (R. 541-43). She complained of continued lower back pain, but other than lumbar tenderness, her physical examination was normal. (R. 541-43). Plaintiff

reported that she had a TENS unit, but had not been using it. (R. 541). Dr. Tapal recommended that Plaintiff engage in aerobic exercise. (R. 543). Plaintiff was assessed with fibromyalgia, degenerative disc disease, and hypertension. (R. 543). On that visit, Dr. Tapal specifically noted that "all the usual fibromyalgia tender points were present." (R. 543).

On March 11, 2008, Plaintiff was three months post surgery and returned to Dr. Chou, who noted that her neck was pain free. (R. 665). Dr. Chou also noted that Plaintiff had low back pain due to degenerative disc disease at L4-5 and L5-S1. He noted that Plaintiff was a chronic narcotic medication user and indicated that he would refer her to a pain management doctor. (R. 665).

On May 7, 2008, Plaintiff was evaluated by Joseph Waling, M.D., on referral from Dr. Chou. (R. 504-08). Plaintiff complained of lower back pain that radiated into her legs. (R. 504). Dr. Waling reviewed the December 2007 MRI. (R. 508). A physical examination showed some foot/ankle edema, a positive straight leg test, some diminishment of sensation in the S1 dermatome and lumbosacral pain, but normal strength and reflexes. (R. 506-07). Dr. Waling scheduled nerve blocks at L3-5. (R. 508). Plaintiff underwent steroid injections of her lumbar spine on May 13, 2008. (R. 502-03).

Plaintiff received physical therapy from August to October 2008 for lumbosacral spondylotic at Advanced Therapy Innovations. (R. 585-618). The observations made by the physical therapist included leg length difference, lumbar pain, and decreased lumbar range of motion affecting her ability to perform functional mobility skills. (R. 585). She reported consistently having

severe pain during and after performing activities of daily living. (R. 589). It was noted that her prognosis was an "excellent rehab potential to reach and maintain prior level of function." (R. 586).

On August 16, 2008, Plaintiff told Dr. Waling that she experienced a 20-25 percent improvement that lasted approximately one and a half months following her May 2008 nerve block. (R. 546-48). Nonetheless, she reported continued pain. (R. 546-47). Dr. Waling recommended physical therapy and a heel lift, and he performed a right sciatic nerve block. (R. 548-50).

Plaintiff was seen in follow-up by Dr. Waling on October 31, 2008, with complaints of low back pain that radiated into her lower extremities. (R. 619-21). He reviewed her prior MRI from December 2007 and provided a diagnosis that included lumbar spondylosis without mylopathy; a right foraminal annular tear at the level of L5-S1; degenerative disc disease at L4-5 and L5-S1; sciatic nerve pain; depression; and fibromyalgia. Dr. Waling also opined that Plaintiff's pain could be coming from the annular tears and noted that she had failed conservative treatment including medication, physical therapy, and nerve blocks. (R. 621).

On November 11, 2008, Dr. Waling performed a 3-level provocative discogram at L3-4, L4-5, and L5-S1 which demonstrated concordant pain, including pain in the back and pain radiating down the back of her leg to the top of her foot upon injection into both L4-5 and L5-S1. (R. 639-40). Dr. Waling noted that at the L4-5 level she had concordant pain going from the buttocks, posterior leg, and into her foot. At L5-S1 she had concordant pain. It was Dr.

Waling's opinion that the concordant pain at the L4-5 and L5-S1 level with pain radiating from the back down into her leg and to the top of her foot are similar to what she complained about prior to the procedure.  He felt that may correspond with her 2007 MRI that showed her to have an annular tear at L5-S1 as well as degenerative disc disease at L4-5 and L5-S1.  (R. 640).  He opined that further clinical correlation may be required and that his findings could more clearly be seen on a post-discogram CT.  (R. 640).  The CT-scan performed later that day showed a right annular tear at L4-5 with moderate degenerative change and a diffuse disc protrusion at L5-S1, resulting in mild foraminal narrowing.  (R. 642).

On December 11, 2008, Dr. Chou decompressed Plaintiff's discs at L4-5 and L5-S1 and fused her spine at the same levels.  (R. 653-55).  The History and Physical from her hospitalization indicated chronic low back pain for three years prior to surgery; a history of degenerative disc disease in her cervical spine and lumbar spine; a previous successful surgery on her cervical spine; but failed conservative management for her lower back pain including injections, physical therapy, and pain medication.  (R. 655).  On follow-up on December 24, 2008, Plaintiff reported that she was getting around fairly well.  (R. 651).  She was told to use her walker more and her wheelchair less.  (R. 651).

### b.  Mental Impairments

On June 12, 2006, Plaintiff met with her therapist, Kathy Adams, with complaints of depression and anxiety.  (R. 216-18).  Plaintiff reported a difficult childhood that resulted in her marriage at age 16.  She reported that she had quit her job at Mr. Gatti's after struggling with coworkers and had settled into a

job as an at-home childcare provider. (R. 216). Plaintiff, however, reported that over the past two years she had become more withdrawn and depressed. The symptoms allegedly worsened, and Plaintiff closed her daycare business. (R. 216). Plaintiff also reported panic attacks. (R. 216). Plaintiff did, however, report joy at the upcoming birth of a grandchild and admitted being almost obsessed with purchasing things for the child. (R. 216). Additionally, Plaintiff reported obsessively cleaning her kitchen for as much as five hours each night from 10:00 p.m., to 3:00 a.m. It was also noted that Plaintiff had other health issues including diabetes, degenerative disc disease, high blood pressure, and sleep apnea. (R. 217). Plaintiff was diagnosed with major depressive disorder, single, moderate; and panic disorder without agoraphobia. She was assigned a GAF score of 45 current and 60 highest in the past year. (R. 218). Two months later, on August 2, 2006, Plaintiff told Ms. Adams that she went for a visit to Tennessee. (R. 384).

On August 30, 2006, Plaintiff reported depression and panic attacks, but she informed Ms. Adams that she went to church every week and held a successful baby shower for her daughter. (R. 385). Additionally, Ms. Adams indicated her concern that Plaintiff was using medicine for her mental disorder instead of the coping skills she had been taught; Ms. Adams indicated that Plaintiff's actions disrupted the therapy process. (R. 386). Ms. Adams further indicated that Plaintiff's physician, Dr. Mijares, was concerned that Plaintiff's physical impairments were actually psychological. (R. 386).

On September 26, 2006, Plaintiff underwent a psychiatric evaluation with Dr. David Hilton, M.D. (R. 391-96). Dr. Hilton indicated that Plaintiff's past two months of treatment constituted her first episode of treatment by mental health professionals. (R. 391). Dr. Hilton noted that Plaintiff had a tendency to over-endorse her symptoms. (R. 392, 394). Dr. Hilton explained that during his examination of Plaintiff "her affect was not consistent with someone as profoundly depressed as she is reporting." (R. 394). He also noted that there was "no reason" that she should be taking Oxazepam, Lorazepam, and Clonozepam, all at the same time as she was. (R. 395).

On February 7, 2007, Plaintiff told her psychiatrist and her therapist that she was going on a two-week vacation to Florida with her sister. (R. 533-34). She also admitted that her anxiety and stress were better, she was sleeping better, she was not having nearly as many panic attacks, and she was having no side effects from medication. (R. 533). She also reported that she was reading her Bible daily, scrapbooking, talking to friends, and going to church every week. (R. 534). On March 12, 2007, her therapist noted that she had been volunteering for a month at a food bank. (R. 532).

On November 7, 2007, it was noted that Plaintiff volunteered at church and the Red Cross, but had only stopped because of a car accident. (R. 522).

On November 8, 2007, Ms. Adams wrote a letter indicating that Plaintiff's mental health situation had stabilized, that she would always have some depression and anxiety, but that she had learned new coping skills. Ms. Adams

released Plaintiff, indicating that she had obtained maximum benefit from the mental health services. (R. 521).

Plaintiff was seen at Southwestern Indiana Mental Health for a psychiatric evaluation by social worker Sarah Lubbers on March 25, 2008. (R. 511-14). She reported suffering from depression, anxiety, and obsessive compulsive behavior. (R. 511). Plaintiff reported that she underwent a series of stressful events during the spring and early summer of 2007: her daughter and grandson moved to Florida; she was in an automobile accident; her husband had a heart attack; her brother died; and she lost her house due to the loss of her job.[1] (R. 513). She was diagnosed with depressive disorder, NOS; rule out anxiety disorder; rule out major depressive disorder; personality disorder, NOS; rule out dependant personality disorder, and she was assigned a current GAF score of 58. It was noted in addition to depression that she appeared to meet the criteria for personality disorder and have traits of dependant personality disorder. (R. 514).

On April 22, 2008, Plaintiff was a no-call no-show for group therapy at Southwestern Indiana Mental Health. Upon being informed of the no-show, Plaintiff indicated that she was busy planning a trip to Florida; her group therapy was consequently terminated. (R. 510).

---

[1]A therapy note from June 19, 2007, indicated that, in reaction to these stressful events, Plaintiff was "tolerating her anxiety and depression well." (R. 528). Additionally, a therapy note from July 24, 2007, indicated that Plaintiff was "doing pretty well" until this recent stretch of stressful events. (R. 527).

On May 15, 2008, a note from Southwestern Indiana Mental Health indicated that Plaintiff was a no-call no-show for her appointment and that Plaintiff was being sent a letter terminating her service due to noncompliance and the belief that she had obtained maximum benefit from therapy.  (R. 509).

## 2.  State Agency Review

On July 10, 2006, M. Ruiz, M.D., evaluated Plaintiff's physical impairments and found them to be non-severe.  (R. 234).

On August 1, 2006, state agency psychologist Donna Unversaw, Ph.D., completed a Psychiatric Review Technique.  (R. 246-62).  Dr. Unversaw indicated that Plaintiff suffered from an affective disorder and an anxiety-related disorder. (R. 246).  Plaintiff had mild restrictions in activities of daily living, moderate difficulties maintaining concentration, persistence, or pace and maintaining social functioning, with one or two episodes of decompensation.  (R. 256). Plaintiff was moderately limited in her ability to complete a normal workday, to get along with coworkers, and to respond to changes in work setting, but otherwise demonstrated normal results.  (R. 261).  On October 30, 2006, F. Kladder, Ph.D., affirmed this assessment.  (R. 397).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes

that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during

steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through December 31, 2008;  Plaintiff also had not engaged in substantial gainful activity since the alleged onset date.  (R. 14).  The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had eight impairments that are classified as severe: fibromyalgia; obesity; hypertension; diabetes mellitus with elevated A1C; multiple spine surgeries, the latest in November 2008; obstructive sleep apnea; depression; and anxiety.  (R. 14).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 15).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 17-20).  Consequently, the ALJ concluded that Plaintiff retained the RFC for light work, except she is limited to:  sitting six hours and standing/walking four hours in an eight-hour workday but no more than one hour at a time; occasionally stooping, kneeling, crouching, crawling, and climbing stairs; never climbing ladders, ropes, or scaffolds; never working around unprotected heights or around dangerous machinery; only performing unskilled work with one or two step instructions; no more than superficial contact with coworkers/supervisors/ the public; and no rigid deadlines or high production standards.  (R. 17).  The ALJ opined that Plaintiff did not retain the RFC to perform her past work.  (R.

21).  However, Plaintiff retained the RFC to perform a significant number of jobs in the regional economy, including clerical addresser/sorter (2,100 jobs), security monitor (1,800 jobs), and small product sorter (2,300 jobs).  (R. 22). The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 22).

## VI.  Issues

Plaintiff has essentially raised four issues.  The issues are as follows:

1.  Whether the ALJ failed to address all of the objective medical evidence.

2.  Whether the ALJ failed to consider Plaintiff's diagnosis of fibromyalgia.

3.  Whether the ALJ conducted a flawed credibility determination.

4.  Whether the ALJ's RFC determination is supported by substantial evidence.

### Issue 1:  Whether the ALJ failed to address all of the objective medical evidence.

Plaintiff first argues that the ALJ failed to consider objective medical evidence in the record.  Specifically, the Plaintiff notes that she had surgery of the lumbar spine in December 2008, and the ALJ did not properly address this surgery.  Plaintiff further argues that the ALJ committed error when he essentially "played doctor" by determining that Plaintiff would only need a six-month recovery period for the surgery.  The ALJ, in fact, explained that "[n]o evidence of any residuals from this surgery which could be expected to last for 12 months are contained in the record.  The claimant's recovery period could reasonably be expected to last six months given the nature of this surgery."  (R. 15).

Plaintiff's situation presents a unique scenario where Plaintiff alleged her disability began in May 2006, was in a motor vehicle accident on October 22, 2007 (R. 414-15), subsequently had surgeries on her cervical spine in December 2007 and lumbar spine on December 11, 2008, and ceased to be insured for DIB on December 31, 2008. The objective medical evidence *clearly* indicates that Plaintiff was not disabled prior to the October 22, 2007, motor vehicle accident. Exams in February 2006 (R. 275-76), May 2006 (R. 206-07), September 2006 (R. 399-400), and September 2007 (R. 405-09) yielded relatively normal results. After the motor vehicle accident, the objective medical evidence reveals that Plaintiff successfully recovered from her December 2007 cervical spine surgery; medical records from March 2008 (R. 665) and December 2008 (R. 655) note that the surgery was a success and that Plaintiff was no longer suffering from neck pain. However, Plaintiff continued to experience lower back pain throughout 2008 and ultimately underwent a lumbar spine fusion. The only medical evidence in the record subsequent to the December 2008 surgery was a follow-up note two weeks after the surgery that indicated that Plaintiff was getting around fairly well. (R. 651).

The ALJ rendered his decision in March 2009, three months after Plaintiff's surgery. However, the Appeals Council did not affirm the decision of the ALJ until August 2009. Plaintiff was provided the opportunity to present additional evidence to the Appeals Council regarding her condition, yet there was no evidence provided that indicated that her condition had failed to improve after the December 2008 surgery. Even though Plaintiff's insured status expired on

December 31, 2008, she could have presented evidence that indicated that her condition did not improve. Instead, the ALJ was left with an overall medical picture that revealed that Plaintiff was not disabled prior to October 2007, that she recovered adequately from her 2007 cervical surgery, and that she was in the process of recovering from her 2008 lumbar surgery. Given all of the objective medical evidence, the ALJ was free to conclude that Plaintiff's December 2008 surgery was a success and that Plaintiff failed to provide objective medical evidence that contradicted this conclusion. Therefore, nothing about the ALJ's assessment of Plaintiff's surgeries was improper.

**Issue 2: Whether the ALJ failed to consider Plaintiff's diagnosis of fibromyalgia.**

Next, Plaintiff finds fault in the ALJ's treatment of her diagnosis of fibromyalgia. Plaintiff claims that "the ALJ fails to even mention [fibromyalgia] in his discussion, much less to evaluate it." (Plaintiff's Brief at 16). Plaintiff's argument is unfounded. The ALJ explicitly indicated that he found Plaintiff's fibromyalgia to be a severe impairment. (R. 14). He then limited Plaintiff to light work with a sit/stand option due to her spine surgeries and fibromyalgia. (R. 21). The Court has found no piece of objective medical evidence in the record which suggests that Plaintiff suffered from further limitations due to her fibromyalgia. Therefore, the ALJ's decision concerning Plaintiff's fibromyalgia is supported by substantial evidence.

**Issue 3: Whether the ALJ conducted a flawed credibility determination.**

Plaintiff also argues that the ALJ conducted an improper credibility determination including failing to address Plaintiff's medications. An ALJ's

credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain. Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or*

*psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional

limitations and restrictions due to pain or other symptoms. 20 C.F.R. §
404.1529(c)(3)(i)-(vii).

The ALJ, in this case, conducted an extremely thorough examination of
Plaintiff's credibility as follows:

> During the hearing, the claimant stated that she has no problems
> with reading and can get the right change money. She is 5' and
> weighs 210 pounds. She is right hand dominant. She stated she
> does not use insulin for her diabetes and checks her blood sugar
> levels everyday. She stated she tested her blood sugar the day of the
> hearing and got a 130, which is good for her. She stated before she
> was on a higher dose of Metformin she was in the 300s. She stated
> her dosage was changed 6 weeks to a month before the hearing.
>
> The claimant stated she has blurry vision and has had this checked
> in relation to her diabetes. She stated the fibers in her left eye are
> weak and a doctor recommended over the counter glasses.
>
> The claimant stated she had a cervical fusion in December of 2007.
> She stated she had another surgery in August of 1992 in the same
> area. She stated she has pain in her lower back as well and rated
> this pain between a 7 and 9 on a 10 point pain scale. She takes
> Lortab for this. She stated she also lies down. If she is sitting she
> will try to walk it out. She stated [she] has a firm mattress.
>
> The claimant stated she can sit in a chair for 25 to 30 minutes. She
> stated she can be on her feet for 10-15 minutes. She stated she
> leans on a cart while shopping. She stated she can lift a gallon of
> milk with two hands. The claimant stated she has been diagnosed
> with fibromyalgia.
>
> The claimant stated she has crying spells two to three times per
> week and sometimes wishes she would not wake up, though she has
> not developed a plan to harm herself. She stated her weight
> fluctuates. She stated she can sometimes sleep at night, but is
> sometimes awakened by her pain. She stated sometimes her
> medicine makes her better and then at other times she will be awake
> all night and will want to sleep during the day.
>
> The claimant stated she has sleep apnea and has a CPAP which she
> cannot sleep without. She falls asleep in a chair and feels as if she
> cannot breathe. She feels like she is hyperventilating. She snores

loudly without her CPAP. She has been using the CPAP for four to five years. She stated she was using this before she closed her daycare business, but did not notice any difference in how tired she was during the day. She has not been tested further for her sleep apnea.

The claimant stated she has panic attacks which manifest in shaking, getting flushed, rapid heart rate, crying and forgetfulness. Her chest also hurts during an attack. These attacks happen several times per month out of the blue. These occur while reading or watching television. She takes Klonopin. She stated when she has chest pain she goes to the hospital, but they normally do not find anything. Her panic attacks last from 5-15 minutes. She takes Klonopin regularly. The claimant stated she heard voices in her head before being put on Lorazepam. She was on Neurontin and then on Lyrica, but felt the Neurontin worked better for her.

The claimant stated she does not cook on the stove because she leaves it on. She stated with her medication she tends to forget things. She uses the microwave. She testified she does not dust, mop or vacuum. She went to Wendy's the day before the hearing. She does not like to be around other people. She uses the computer to communicate with her daughter.

When questioned by her attorney, the claimant stated she had surgery for carpal tunnel syndrome on her right hand in 1992, but now has problems using her right hand and cannot write due to her hand shaking. She cannot write letters but can type on a keyboard for 30 minutes to an hour. She has trouble raising her arm above her head and has hand cramps and shakes a lot.

The claimant stated she has to force herself to eat. She spills soup and cannot cut meat. She has to use her fingers to pick up meat. She likes to go into her bedroom and shut the door, turn off the lights and be by herself. She is at home most of the day by herself. She stated she does not interact with her family.

The claimant stated she watches television, but her mind wanders and she cannot focus. The claimant sometimes wears her hair up, which she sometimes does herself. The claimant stated she and her daughter have some conflict issues. She stated her daughter was wild, but has calmed down now. The claimant stated this has abated her depression somewhat. She stated her other daughter moving also depressed her. She stated she learned distraction and relaxation techniques which sometimes help, but not always. She

stated she used to be a very social person but no longer goes to the store because she does not like being around others.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged inability to work due to a mental impairment, the undersigned finds the objective record simply does not support such an allegation. Signs and findings on objective examination have been relatively benign. The claimant is noted as being adequately dressed and groomed with logical, sequential and relevant thought processes in June of 2006, just one month after her alleged onset date. Her memory was noted as being intact and while the claimant reported she isolates herself, she also reported the ability to go out in public. (Ex. 6F).

It is noted by the claimant's psychiatrist that the claimant's affect was not consistent with someone as profoundly depressed as she was reporting and that her overall presentation was not consistent with someone with psychosis. She is reported to be very somatically preoccupied and heavily medicated on sedatives. One of the claimant's treating physicians even questioned how someone on so many sedatives could simultaneously be having panic attacks with the frequency the claimant alleged. (Ex. 19F).

In terms of the claimant's alleged inability to work due to a physical impairment, the undersigned finds the claimant is not credible. The claimant has had several emergency room visits and physical examinations by various doctors, all of which have resulted in relatively normal signs and findings. (Ex. 5F; 17F; 21F). The claimant had cervical spine surgery in December of 2007. The claimant's records indicate the claimant was doing fine in January of 2008 and reported to her doctor that her arm pain, which was a precipitating factor to her surgery, was mostly gone. (Ex. 25F). The claimant has undergone gallbladder x-rays, a barium swallow, an esophagram and a carduilite exercise test, none of which showed any severe abnormalities. (Ex. 5F). The claimant's treating physician makes no mention of any disabling condition. (Ex. 13F).

The claimant testified she is unable to write due to residuals from her carpal tunnel and tremors. Interestingly, the claimant's records indicate relief of her symptoms after having a right carpal tunnel release. (Ex. 7F 5). It is also reported by the claimant's neurologist that when the claimant's attention is diverted with conversation all of her alleged tremors stop. (Ex. 21F). The claimant testified her blood sugars were spiking to 300 until she was given a higher does [sic] of Metformin. She testified she checked her blood sugars daily. Yet the record indicates the claimant was not checking her blood sugar regularly as late as December of 2007. (Ex. 23F). The claimant has a normal gait and is noted as over endorsing her symptoms. (Ex. 19F; 21F). Such signs and findings do not comport with a finding of total disability.

The undersigned notes that the claimant's testimony concerning her daily activities is not supported by the objective record. The claimant testified she is tired during the day due to sleep apnea. However, the claimant also testified she was diagnosed with sleep apnea four to five years before the date of the hearing and that she was able to work with small children in her daycare business even after being diagnosed. *(see* Ex. 39F).

The claimant testified she has panic attacks several times per month, but also reported to her therapist that her panic attacks had not occurred for two months in March of 2006. (Ex. 28F 3). In October of 2007 the claimant reported she did not have panic attacks at home. (Ex. 28F 15). Additionally, the claimant's psychiatrist opined it would be difficult for someone as sedated as the claimant was on various medications (Oxazepam, Lorazepam and Clonazepam) to simultaneously have panic attacks. (Ex. 10F 9). Interestingly, claimant's therapist questioned her diagnosis at one point because of a possible somatic disorder and the claimant's pursuit of a disability claim. (Ex. 18F 9).

The claimant has been assigned a number of global assessment of functioning (GAF) scores ranging from 45, indicating serious symptoms, to 58, indicating moderate symptoms. (Ex. 6F; 28F). Given the claimant's daily activities, as discussed below, the undersigned finds that the claimant's GAF scores are inconsistent with the longitudinal record and are thus given little weight.

The claimant testified she cannot dust, mop or vacuum. Yet, in June of 2006 the claimant noted she does, in fact, sweep, mop, wipe counters and do dishes. (Ex. 3E 7). The claimant also reported in October of 2006 that she cleans, prepares light meals, watches

television, bathes and dresses herself, does laundry, sweeps, mops and drives. (Ex. 7E pp. 2, 3). The claimant testified during her hearing that she does not like being around people and then in the next breath testified she had gone to Wendy's with her family the day before the hearing.

The claimant has been able, with her numerous impairments, to travel to Tennessee, attend church every week and hold a baby shower for her daughter. (Ex. 18F). The claimant volunteers at her church, plays computer games, has volunteered at a food bank, reads the Bible, does scrap booking, talks to her friends on the phone, has gone to Florida to visit her daughter and on a vacation with her sister. (Ex. 28F). Such activities seriously diminish the claimant's testimony concerning her daily activities and do not comport with a finding of total disability.

(R. 17-20). Plaintiff argues that this credibility finding was "boilerplate." The Court could not disagree more. The ALJ provided an assessment that comported with the requirements of 20 C.F.R. § 404.1529. As discussed above, there is simply no objective medical evidence to support Plaintiff's allegations of disabling pain prior to her motor vehicle accident in October 2007. Additionally, while Plaintiff had two surgeries on her back after the motor vehicle accident, *all* of the objective medical evidence indicates that Plaintiff recovered from her cervical spine surgery with no residual pain, and there is no evidence in the records that suggests that she did not also recover from her lumbar spine surgery.

The Court also notes numerous instances in the record concerning Plaintiff's activities of daily living that supports the ALJ's decision that Plaintiff was not fully credible. At the same time that Plaintiff claims she was disabled due, in part, to disabling pain, she admitted to her therapist that she obsessively cleaned her kitchen every night for as much as five hours from 10:00 p.m., to 3:00 a.m. (R. 217). Furthermore, Plaintiff testified to severe depression, anxiety,

and panic attacks that kept her from interacting with others or leaving her home. Yet, the records indicate that Plaintiff did the following: vacationed in Tennessee (R. 384); went to church every week and hosted a successful baby shower for her daughter (R. 385); went on a two-week vacation to Florida (R. 533-34); read the Bible daily, scrapbooked, and talked with friends (R. 534); volunteered at a food bank for a month (R. 532); volunteered at church and only stopped because of a car accident (R. 522); and failed to show up at therapy because she was busily planning a trip to Florida (R. 510). The nature and numerosity of all of these activities seriously undermine Plaintiff's claims of a disabling mental condition, and the ALJ was warranted in relying on these activities to find Plaintiff not credible.

Finally, the ALJ reasonably noted that there was evidence in the record that Plaintiff exaggerated her symptoms. Dr. Mufti observed that Plaintiff's tremors ceased after Plaintiff's attention was diverted. (R. 398). And, Dr. Hilton noted that Plaintiff had a tendency to over-endorse her symptoms and that Plaintiff's "affect was not consistent with someone as profoundly depressed as she is reporting." (R. 392, 394).

As for Plaintiff's allegation that the ALJ failed to account for the side effects of Plaintiff's medications, the record indicates that the ALJ took note of Plaintiff's medications, including Metformin for her diabetes, Lortab for her back pain, and Klonopin, Neurontin, and Lorazepam for her mental disorders. No medical professional has indicated that these medications limit Plaintiff's ability

to engage in substantial gainful activity. Therefore, the Court concludes that the ALJ did not conduct a flawed credibility determination.

**Issue 4: Whether the ALJ's RFC determination is supported by substantial evidence.**

Finally, Plaintiff argues that the ALJ's RFC determination does not account for all of her impairments. However, the ALJ reasonably limited Plaintiff to light work with a sit/stand option in recognition of her fibromyalgia and spine surgeries, limited Plaintiff's postural activities and ability to work at heights or around machinery based on her multiple impairments, and limited her to simple work with no strict production requirements and minimal contact with others based on Plaintiff's mental impairments. The objective medical records do not indicate that any further limitations were necessary, and the ALJ's RFC determination is supported by substantial evidence.

## VII. Conclusion

The ALJ examined all of the relevant medical evidence concerning Plaintiff's back surgeries. The ALJ did not ignore Plaintiff's diagnosis of fibromyalgia. The ALJ's credibility determination was not patently wrong. And, the ALJ's RFC determination is supported by substantial evidence. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 17th day of February, 2011.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

David K. Robinson
dave@dkrobinsonlaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov